IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

ETHEL HARVEY,                          )
                                       )
                    Plaintiff,         )
                                       )
                                       )
v.                                     )          No. 3:09-CV-523
                                       )
AMERICA'S COLLECTIBLES                 )
NETWORK, INC., d/b/a JEWELRY           )
TELEVISION,                            )
                                       )
                    Defendant.         )

## MEMORANDUM OPINION

This civil action is before the court for consideration of "Defendant's Motion for Summary Judgment" [doc. 13]. Plaintiff has filed a response in opposition [doc. 24], and defendant has submitted a reply [doc. 30]. Oral argument is not necessary, and the motion is ripe for the court's determination. For the reasons that follow, the motion will be granted, and this case will be dismissed.

Plaintiff has brought suit for alleged age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Plaintiff has also alleged causes of action under the Tennessee Disability Act ("TDA"),[1] Tenn. Code Ann. § 8-50-103, the

---

[1] The Tennessee Handicap Act ("THA") was amended effective April 7, 2008, and is now known as the Tennessee Disability Act. Tenn. Code Ann. § 8-50-103(a); *Whited v. Cmty. Bank of Cumberlands, Inc*., No. 2-08-0061, 2010 WL 605280, at *8 n.3 (M.D.Tenn. Feb. 18, 2010). "A claim brought under the THA is analyzed under the same principles as those utilized for the Americans (continued...)

Tennessee Human Rights Act ("THRA"),[2] specifically Tenn. Code Ann. § 4-21-302 *et seq.* and § 4-21-401, and claims under Tennessee common law for retaliatory discharge and outrageous conduct.

## I.

### *Background*

Plaintiff began working as a shipping agent for defendant on January 10, 2005; she was 69 years old when she was hired. She left defendant's employment on May 4, 2009, at the age of 73. As a shipping agent, plaintiff packed and shipped jewelry orders. At the time she was hired, plaintiff worked a 12-hour shift, which she did for 24 days before she asked to be placed on an 8-hour shift. The request was granted, and plaintiff began working an 8-hour shift. She testified in her deposition that the need for the change was the "general fatigue" of working a 12-hour shift. Plaintiff worked the 8-hour shift first on days and then on a night shift. At plaintiff's request, she was placed back on the day shift on May 5, 2008,

_____

[1](...continued)
with Disabilities Act ("ADA")." *Id.*; *see also Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 n.5 (6th Cir. 2008) ("Both federal and Tennessee disability discrimination actions require the same analysis."). Therefore, the analysis and conclusions concerning plaintiff's ADA claim apply equally to her TDA claim.

[2] The THRA prohibits age discrimination and substantially mirrors the ADEA. In dealing with cases brought pursuant to the THRA, Tennessee courts have applied the same standards as those applied in federal courts in addressing cases brought pursuant to the ADEA. *See Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984); *Trentham v. K-Mart Corp.*, 806 F. Supp. 692 (E.D. Tenn. 1991); Tenn. Code Ann. § 4-21-401(a)(1)*; see also Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006). Accordingly, the analysis and conclusions regarding plaintiff's ADEA claim apply equally to her THRA claim.

still working an 8-hour shift. The change was to facilitate better sleeping for the plaintiff.

Beginning in March 2006, plaintiff received approval for intermittent FMLA leave for migraine headaches, which she could suffer several times per month. She provided initially a letter from a Dr. Hetrick that was renewed each year. Her FMLA leave for migraine headaches was renewed in March 2009 with a certification by Dr. Hetrick. Plaintiff also provided a letter from a Dr. Rist. Letters from both doctors were provided by plaintiff in June 2008 to excuse her from working mandatory overtime. The letter from Dr. Rist, dated June 18, 2008, referenced that plaintiff has neurodermatitis and stated that "it is imperative that she work no more than a regular daily shift for five days a week." The letter from Dr. Hetrick, dated June 20, 2008, referenced plaintiff's migraine headaches and "recommend[ed] that [plaintiff] not be required to work more than 8 hours per day or 40 hours per week."

Effective March 1, 2009, defendant initiated a point system concerning hourly attendance. Points are assigned based upon the amount of time missed. For missing up to half a shift, 0.5 point is assigned. Once 10 points have been accumulated, termination results.

On March 10, 2009, plaintiff's entire department began working 10-hour shifts and a 37.5 hour workweek. Defendant points out that in reality employees work 9 ½ hours for three days  and 9 hours on the fourth day.  Once this change was made, 8-hour shifts were no longer available in the shipping department. Harvey started working the 10-hour

shifts. From March 12-29, 2009, plaintiff was absent for gallbladder surgery. She returned March 30, 2009, and worked the 10-hour shifts.

According to plaintiff, after she returned from her surgery absence, she met with Omar Tekin and Linda Brack. At the relevant time, Brack was plaintiff's supervisor, and Tekin was the shipping manager. Plaintiff testified that when she returned and worked the longer shifts she suffered a migraine and went to her doctor who asked her if she was still working 8-hour shifts. She told him that she was not. After that she met with Brack and Tekin. Plaintiff's testimony is that Tekin threw the letter back at her saying they did not take doctor's letters. Brack and Tekin both testified that Human Resources ("HR") through Natalyn Webster had responsibility for addressing physician letters and restrictions.

The deposition testimony regarding the June 2008 letters is rather confusing. Plaintiff testified that Brack told her she did not have a copy of the letters, though plaintiff says she did not believe her since plaintiff had given a copy to her prior supervisor, Yvonne. Plaintiff also testified that she had kept a copy of the letters but she made the decision not to bring them to Brack's attention, though Brack said she had never seen them. Plaintiff could not recall whether she told Webster anything about the letters. Plaintiff then stated that she thought she told Webster the letters were on file. Both Brack and Webster testified that they had never seen the June 2008 letters.[3] When asked at her deposition why she did not bring another copy of the letters in, plaintiff said, "Because I left."

_____

[3] The letters were eventually found in a file and produced in discovery.

After a break, plaintiff wanted to return to the issue of the letters. She testified that they were originally provided to keep her from working mandatory overtime and the letters state she should work 8 hours. Plaintiff then stated that she did give a copy of the letters to Brack after she gave them to Yvonne, though she did not remember when. Plaintiff further stated that originally the letters were related to mandatory overtime, but right before she left she gave them to Brack who gave them to Tekin. That is when he "throwed them back across the desk at me." Plaintiff testified that she gave the letters to Brack only once, but she was not sure whether it was after she returned from gallbladder surgery. However, she stated that after she returned from surgery and had the meeting with Tekin and Brack, she gave the letters to Brack that morning or the day before.[4]

---

[4] The following exchange occurred in plaintiff's deposition:

> Q.     Ms. Harvey, before the break, you stated you did not bring these letters back to Jewelry TV because they were in the file where Ms. Watson had put them. Did you not tell us that?
>
> A.     I may have, but that - - that was a long time before this last thing that we're talking about now.
>
> Q.     But you stated - - correct me if I'm wrong, but you stated this morning that you made a decision not to bring these two letters back to Jewelry TV because they had them in the file, and Ms. Brack was lying. Is that what you told us this morning?
>
> A.     That's exactly what I said, yeah.
>
> Q.     Now you're describing that after you came back from gallbladder surgery, in fact you did bring these two letters out to Jewelry TV. Is that correct?

(continued...)

Brack sent an email to Webster in the HR Department about plaintiff's request for an 8-hour shift on April 21, 2009. A meeting was scheduled for April 22, 2009, to include plaintiff, Brack, and Webster. Plaintiff testified in her deposition that she seemed to recall a meeting with Webster before she left the company, but she did not remember what it was about. She did not recall what was stated in the meeting or who was present. Plaintiff stated, "I vaguely remember being in there, but I don't remember what I went in there for." Plaintiff did recall:

> Q. Do you remember Ms. Webster asking you what condition you had that prevented you from working more than eight hours a day?
>
> A. Yes. I told her I had migraine headaches, and from - - I had stress from the job. I went to a dermatologist over stuff on my head, and he said it was from stressing over work. She knows that.

---

[4](...continued)

|                   |                                                         |
|-------------------|---------------------------------------------------------|
| THE WITNESS:      | Can I go out there and talk to you for a minute?        |
| MR. WAGNER:       | No, absolutely not.                                     |

BY MR. BAILEY:

Q. Not while a question is pending. Absolutely not.

|                   |                                                         |
|-------------------|---------------------------------------------------------|
| MR. WAGNER:       | And I'd remind her, Martin, that she is under oath.     |
| MR. BAILEY:       | She knows that.                                         |
| MR. WAGNER:       | She is under oath.                                      |
| THE WITNESS:      | I don't remember.                                       |

Q.   And you told Ms. Webster this in this meeting?

A.   I may have.  That may have been what it was about, but
     I don't know.  I don't remember.

Webster testified that at the meeting on April 22 plaintiff kept saying it was her health that prevented her from working a 10-hour shift.  Webster asked plaintiff to get specific information from her doctor so that options could be considered.  Webster offered that day to look at other positions in the company and with interviewing skills, but told the plaintiff that until she obtained the information from her doctor she did not know what other options there were.

Brack testified that at the April 22 hearing plaintiff was given the option of looking for a position within the company that would meet her 8-hour shift request but that more information was needed from her doctor.  Brack stated that Webster gave plaintiff the directives concerning obtaining the information from a doctor.  Brack further testified that Webster specifically asked plaintiff what condition prevented her from working the 10 hours, and plaintiff never responded.  Both Brack and Webster testified that a part-time position in the customer care department was offered to plaintiff, which she immediately rejected.

On April 27, 2009, Brack sent an email to Webster stating as follows:

Ethel Harvey said that she can not get a doctors note stating she can work over 8 hours.  She wishes to be terminated after she goes home early for 20 days (10 points).  She said she can draw unemployment after a waiting period.  Do we have any options for her at this point?  Also, did we ever see the note that states

she cannot work over 8 hours?  I know that I didn't.  Does such a note exist?

When asked about this email, Webster stated, "Again, we asked her to bring a document - -  some documentation from the doctor that stated what she can do, because she's telling us due to her health, she can't work 10 hours, so we weren't going to require her to work 10 hours. . . .What we said to her was, we need information from the doctor, what is your condition, and what can you work."

Plaintiff worked several days leaving early and on May 4, 2009, submitted her letter of resignation.  She had asked for a voluntary layoff, but defendant refused to do that.

II.

*Standard of Review*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party may discharge its burden by  demonstrating  that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Id.* at 323. Although the moving party has the initial burden, that burden may be discharged by  a

"showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Id.* at 325 (emphasis in original).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

III.

*Analysis*

The court will begin by addressing plaintiff's complaints that defendant's discovery responses were deficient. Nowhere in the record is there any indication that plaintiff pursued sanctions or relief pursuant to the Federal Rules of Civil Procedure. If in

her opinion defendant's discovery responses were inadequate or unresponsive, she should have pursued her remedies under the appropriate rules. She did not do that and cannot be heard to complain at this point in time.

Plaintiff has also raised an objection to the use of testimony by Natalyn Webster at plaintiff's unemployment hearing [doc. 22]. Plaintiff contends that pursuant to Fed. R. Evid. 801 and 802 the prior testimony is hearsay and should be excluded. She argues that it does not fall within the exception of Fed. R. Evid. 801(d)(1) addressing the prior statement of a witness. That provision states in pertinent part:

> A statement is not hearsay if - -
> (1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. . .

Fed. R. Evid. 801(d)(1). Plaintiff argues that she does not charge Webster with "recent fabrication" but with "fabrication all along," including prior to the unemployment hearing. Therefore, she contends the testimony is hearsay and should be excluded.

Defendant argues that the testimony falls within the exception of Fed. R. Evid. 801(d)(2) because it contains the admissions of a party opponent, Harvey. Therefore, according to defendant, the prior testimony falls under the exception of Fed. R. Evid. 801(d)(2), which provides in pertinent part that "[a] statement is not hearsay if - - [t]he

statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity. . . ."

Webster's testimony at the unemployment hearing does contain admissible, non-hearsay admissions by a party opponent under Fed. R. Evid. 801(d)(2). In part, Webster testified as to what plaintiff previously told her. However, defendant does not account for the fact that Webster's testimony remains objected to as hearsay and also has to be admissible in order for the party admissions to be received as well. "[I]n order for double-hearsay statements to be admissible, both statements must be excluded from the hearsay definition." *United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005) (explaining court's holding in *Estate of Shafer v. Comm'r*, 749 F.2d 1216, 1220 (6th Cir. 1984)). Defendant has not explained how Webster's testimony is excluded from the hearsay definition. Therefore, plaintiff's objection is well taken, and the testimony will not be considered.

<u>ADA Claim</u>

Plaintiff asserts a claim for violation of the ADA in which she alleges that she was denied an accommodation and as a result was forced to leave. Thus, she contends her resignation was in reality a constructive discharge. Defendant argues that plaintiff was not denied an accommodation. Instead, plaintiff would not provide any updated medical information to support her request for an accommodation when the HR representative Webster met with her and inquired about her need for the 8-hour shift. Defendant contends

that plaintiff left its employment voluntarily and was therefore not constructively discharged.

In order to recover on a claim for discrimination under the ADA, a plaintiff must demonstrate that: "1) he is an individual with a disability; 2) he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and 3) he was discharged solely by reason of his handicap." *Jakubowski v. Christ Hosp., Inc*., --- F.3d ----, No. 09-4097, 2010 WL 4961717, at *5 (6th Cir. Dec. 8, 2010) (quoting *Monette v. Elec. Data Sys. Corp*., 90 F.3d 1173, 1178 (6th Cir. 1996)). Defendant's position is that plaintiff cannot prevail because she was not discharged because of her handicap.

Initially, the court observes that there is no proof in the record that the plaintiff is an individual with a disability as defined by the ADA. Defendant does not make this argument or explicitly concede the point but states that it never had the opportunity to determine whether plaintiff has a qualifying disability because she did not provide the requested medical information. Disability under the ADA is an individual and specific showing. *McPherson v. Fed. Express Corp*., 241 F. App'x 277, 281 (6th Cir. 2007) ("[W]hether a person has a disability under the ADA is an individualized inquiry."). "The term 'disability' means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual. . . ." 42 U.S.C. § 12102(1). Plaintiff has offered no proof of an impairment that substantially limits a major life activity for purposes of the ADA. The June 2008 letters that plaintiff relies so heavily on refer to two different conditions, migraine headaches and a stress-related skin condition.

However, these letters were not submitted for the purposes of ADA disability and do not show that plaintiff is disabled under the ADA. There is no showing that either of the identified conditions substantially limits a major life activity under the ADA. Therefore, plaintiff in this case has not demonstrated that her migraine headaches or her skin disorder meets the definition of disability under the ADA. Arguably, plaintiff has not met the first prong of the prima facie case.

Nevertheless, that having been said, the court will proceed to address the issues of whether defendant failed to accommodate the plaintiff and whether or not she was constructively discharged.


## Failure to Accommodate

Plaintiff contends that defendant refused to accommodate her request to work an 8-hour shift and when defendant required that she submit medical information to support her request she was forced to resign.

The "plaintiff has the burden of proposing an accommodation and proving that it is reasonable. Furthermore, the plaintiff has the burden of proving that he will be capable of performing the essential functions of the job with the proposed accommodation." *Jakubowski*, 2010 WL 4961717, at *6 (internal quotation marks and citation omitted). If the employer takes the extra step of offering a "reasonable counter accommodation, the employee cannot demand a different accommodation." *Id*. A request for an accommodation

involves use of an interactive process between employer and employee.

> The ADA's regulations indicate that, [t]o determine the
> appropriate reasonable accommodation [for a given employee,]
> it may be necessary for the [employer] to initiate an informal,
> interactive process with the [employee]. The purpose of this
> process is to identify the precise limitations resulting from the
> disability and potential reasonable accommodations that could
> overcome those limitations. Accordingly, [t]he interactive
> process requires communication and good-faith exploration of
> possible accommodations. Even though the interactive process
> is not described in the statute's text, the interactive process is
> mandatory, and both parties have a duty to participate in good
> faith. When a party obstructs the process or otherwise fails to
> participate in good faith, courts should attempt to isolate the
> cause of the breakdown and then assign responsibility.

*Kleiber v Honda of Am. Mfg., Inc*., 485 F.3d 862, 871 (6th Cir. 2007) (internal quotation

marks and citations omitted).

> To bear liability for a failure to accommodate, an employer must
> be responsible for a breakdown in the interactive process. *See
> e.g., Templeton v. Neodata Servs., Inc*., 162 F.3d 617, 619 (10th
> Cir. 1998). In this regard, courts have held that an employer is
> not responsible for a breakdown in the interactive process
> unless the employer actually failed to offer a reasonable
> accommodation. *Rehling v. City of Chicago*, 207 F.3d 1009,
> 1016 (7th Cir. 2000).

*Lockard v. Gen. Motors Corp*., 52 F. App'x 782, 788 (6th Cir. 2002). "An employer has

sufficiently acted in good faith when it readily meets with the employee, discusses any

reasonable accommodations, and suggests other possible positions for the plaintiff."

*Jakubowski*, 2010 WL 4961717, at *6.

"An underlying assumption of any reasonable accommodation claim is that

the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Erbel v. Johanns*, No. 3:04-CV-555, 2007 WL 1387331, at *7 (E.D. Tenn. May 8, 2007) (quoting *Edwards v. EPA*, 456 F. Supp. 2d 72, 102 (D.D.C. 2006)).  In this case, defendant did not deny plaintiff an accommodation.  The HR representative met with her and options were discussed, including the customer care position.  However, defendant justifiably asked plaintiff for medical documentation to support her  requested accommodation, which was not provided, and the interactive process was not completed.

> An employer need not accept an employee's word that the employee has an illness that may require accommodation and the employer instead may attempt to confirm or disprove the employee's representation, such as by requiring that the employee provide medical documentation sufficient to prove that he has a condition that needs accommodation or by requiring that the employee undergo a medical exam.

*Sansom v. Cincinnati Bell Tel.*, No. C-1-08-235, 2009 WL 3418646, at *9 (S.D. Ohio Oct. 19, 2009) (citing *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000) (citing *E.E.O.C. v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094-95 (6th Cir. 1998); 29 C.F.R. pt. 1630, App. § 1630.14(c)); *see also Israel v. Tenn. Dep't of Mental Health & Developmental Disabilities*, No. 3:04-CV-314, 2006 WL 2559710, at*8 (E.D. Tenn. Sept. 5, 2006) ("Furthermore, the ADA ... allow[s] employers to make inquiries into an employee's medical conditions or require medical examinations in order to reasonably accommodate that employee.") (citing *Kennedy*, 215 F.3d at 656).  In addition, "[a]n employer is 'not obligated to provide accommodation until plaintiff ha[s] provided a proper

diagnosis ... and requested specific accommodation.'" *Erbel*, 2007 WL 1387331, at *7 (quoting *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998)).

Plaintiff argues that defendant had prior medical letters and that there are material issues of fact concerning who saw these letters and when they saw them. While there are a number of disputed facts regarding the June 2008 letters, disputes primarily created by plaintiff's own testimony, they are not material to the issue at hand.[5] The defendant employer was entitled to specific updated medical information documenting the condition for which plaintiff sought an accommodation under the ADA, not for mandatory overtime or intermittent FMLA leave. The June 2008 letters were not ADA-related. *Stipe v. Shinseki*, 690 F. Supp. 2d 850, 880 n.30 (E.D. Mo. 2010) ("Plaintiff continually argues that defendant has 'all the medical documents' from prior years; however, this is not relevant to the matter at hand. Defendant has the right to request current medical documentation supporting plaintiff's accommodation requests. Plaintiff was specifically informed of the need for this documentation as well as what it had to contain."). Defendant had every right to require plaintiff to provide updated medical documentation to support her request for an ADA accommodation based on a disability. "It is, of course, the employee who bears the burden of providing sufficient information to establish that [s]he has a qualifying impairment that requires accommodation." *Badri v. Huron Hosp.*, 691 F. Supp. 2d 744, 762

---

[5] The court observes that plaintiff cannot create a material issue of fact with her own testimony. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (A party cannot create a genuine issue of material fact merely by contradicting his own prior testimony.).

(N.D. Ohio 2010) (citations omitted). "An employer is not required to speculate as to the extent of an employee's disability or the employee's need or desire for an accommodation. Defendants had the right to substantiate their concerns before they considered accommodations." *Id*. at 763 (internal quotation marks and citation omitted).

Defendant requested substantiating medical information, and plaintiff did not provide it. By not providing the requested information, plaintiff did not participate in the interactive process in good faith, and thus impeded that interactive process. She, therefore, cannot claim that defendant failed to accommodate her under the ADA. In *Williams v. Prison Health Servs., Inc*., 159 F. Supp. 2d 1301 (D. Kan. 2001), the district court concluded that the plaintiff in an ADA failure-to-accommodate case impeded the interactive process when she prevented the release of medical information concerning the duration of her medical restrictions. The district court held, "[defendant] needed to know the duration of plaintiff's work restrictions to assess reasonable accommodations in light of the State's contract. Plaintiff interrupted the interactive process by refusing to give this information to defendant and is thus precluded from claiming that [defendant] failed to provide reasonable accommodation within the ADA." *Id*. at 1311. The district court in *Williams* also noted as follows:

> This case is similar to *Templeton v. Neodata Services, Inc*., 162 F.3d 617 (10th Cir. 1998), in which the plaintiff similarly stopped the interactive process when she refused release of medical certification to her employer. The *Templeton* court stated:

17

> Here, as in *Beck*, the employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation. An employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and the limitations it imposes.

*Id*. (citing *Templeton*, 162 F.3d at 619 (citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996)); *see also Huber v. Gazette Co.*, No. C 98-50 MJM, 1999 WL 33656874, at *9 (N.D. Iowa Oct. 26, 1999) ( "Huber cannot, by her own actions, slow down the accommodations process and then claim that her employer violated the ADA by failing to act quickly enough").

Even in light of the April 27 email from Brack, plaintiff did not engage in the interactive process. While the email indicates that plaintiff says she could not get a letter saying she could work over 8 hours, that is not what she was asked to provide. Webster asked plaintiff to provide medical documentation of her condition and of what she could work, i.e., information that would allow a discussion about her limitations so that options could be explored. There is a difference. In any event, defendant was entitled to request medical documentation of the ADA accommodation, and plaintiff was required to participate in the interactive process and provide the information related to the condition necessitating the accommodation and identifying her limitations.

Defendant herein initiated with plaintiff an interactive process after she

18

indicated she was not able to work an 10-hour shift. Plaintiff impeded that process when she did not provide the medical documentation requested by defendant to substantiate her request for an ADA accommodation. The fact that she had medical letters in her file allowing FMLA leave was not sufficient to support a finding that plaintiff was a person with a disability for purposes of the ADA. Defendant was within its rights under the ADA to require plaintiff to provided the necessary medical information to substantiate her claimed disability and need for an accommodation. Plaintiff's failure to provide the information and the resulting interruption of the interactive process precludes her from claiming that defendant has violated the ADA by not accommodating her. *See Williams*, 159 F. Supp. 2d 1301 (cases cited therein). Plaintiff has not shown that defendant failed to accommodate her.

## Constructive Discharge

Plaintiff contends that although she submitted a letter of resignation, she was actually constructively discharged. She claims that because defendant would not accommodate her need to work an 8-hour shift, she had to leave early and have ½ a point deducted each time until she reached the maximum 10 points and would be discharged. Defendant argues that it allowed plaintiff to follow this procedure to give her sufficient time to obtain the medical documentation to support her requested accommodation. She did not obtain the medical information and chose to resign.

Plaintiff can demonstrate an adverse employment action by showing that she was constructively discharged. *Logan v. Denny's, Inc*., 259 F.3d 558, 568 (6th Cir. 2001) (citing *Kocsis v. Multi-Care Mgmt*., 97 F.3d 876, 886 (6th Cir. 1996)). "A constructive discharge claim 'depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee.'" *Talley v. Family Dollar Stores of Ohio*, 542 F.3d 1099, 1107 (6th Cir. 2008)(quoting *Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004)). A claim of constructive discharge requires a showing that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982); *see also Kocsis*, 97 F.3d at 887. However, "resignations and retirements are presumed to be voluntary. An apparently voluntary resignation does not rise to the level of a constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances." *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004) (citations omitted). In addition, "[a]n employee who quits has 'an obligation not to assume the worst, and not to jump to conclusions too fast.'" *West v. Tyson Foods, Inc*., 374 F. App'x 624, 640 (6th Cir. 2010) (quoting *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991)).

In support of her constructive discharge claim, plaintiff relies heavily on *Talley*, 542 F.3d 1099, a case involving an allegation of constructive discharge in the

context of a claim for failure to accommodate under the ADA.  In *Talley*, the Sixth Circuit

stated:

> [A] complete failure to accommodate, in the face of repeated
> requests, might suffice as evidence to show the deliberateness
> necessary for constructive discharge.  We emphasize that our
> holding today does not pave the way for an employee to assert
> a claim for constructive discharge every time an employer fails
> to accommodate her disability.  But when an employee makes
> a repeated request for an accommodation and that request is
> both denied and no other reasonable alternative is offered, a
> jury may conclude that the employee's resignation was both
> intended and foreseeable.

*Id*. at 1109 (internal quotation marks and citation omitted).

The situation in *Talley* is readily distinguishable from this case.  There was no

"complete failure to accommodate" in this case nor were there repeated requests for an

accommodation that were denied without a reasonable alternative.  The plaintiff in *Talley*

had a medically documented condition, and she "approached her supervisors on numerous

occasions during her employment to discuss her disability and possible accommodations."

*Id*. at 1109.  Plaintiff herein did not provide defendant with medical documentation to

support her request for an ADA accommodation, so the process did not reach the point

where meaningful accommodation options could be discussed or developed.  Defendant

expressed a willingness to meet with plaintiff and actually offered an alternative position

that plaintiff refused.  While plaintiff stated that Tekin rejected her doctor's letters as

unacceptable, Tekin was not the HR representative who dealt with such matters.  The HR

person, Webster, told plaintiff that she needed to provide medical information to support her

accommodation request.  Defendant afforded plaintiff the opportunity to do that, but she left her job instead.

Asking plaintiff to provide medical information to support her accommodation request was not unreasonable, harassing, or improper.  As discussed above, defendant was well within its rights under the ADA to seek verification and documentation for the alleged qualifying disability under the ADA that would entitle plaintiff to an accommodation. Asking her to provide such information did not create an abusive atmosphere such that a reasonable person would feel compelled to resign.  A reasonable employee would have obtained the medical documentation, continued to discuss options offered for positions in the company that were 8-hour shifts, and allow the interactive process to proceed. Defendant had initiated that process by meeting with plaintiff to identify the condition[6] and by even suggesting an alternative position, which plaintiff summarily rejected.  Again, while the April 27 email indicates plaintiff said she could not get a letter saying she could work over 8 hours, Webster had asked her to provide medical documentation of her condition and what she could work as support for her accommodation request.   Plaintiff had sufficient opportunity to meet her obligation regarding the medical documentation during the time when she used the point system and left early.  Certainly, the defendant knew what the result would be after plaintiff left early 20 times, which goes to its intent on the issue of constructive discharge.  However, plaintiff also knew what the result would be, but chose

_____

[6] Again, the June 2008 letters that plaintiff relies so heavily on refer to two different medical conditions.

to leave rather than provide the medical documentation or discuss other options with the defendant regarding her ADA accommodation request. Plaintiff thought the worst and did not see the process through.

Under the circumstances of this case, it was not objectively reasonable for plaintiff to leave her employment. Therefore, plaintiff was not constructively discharged, and without a showing of constructive discharge, plaintiff has not demonstrated an adverse employment action for her alleged claims of discrimination.

ADA  Retaliation Claim

Plaintiff contends that she was retaliated against for exercising her rights under the ADA. To establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate:

> (1) he engaged in protected activity; (2) his engagement in that protected activity was known to his employer; (3) his employer, thereafter, took an adverse employment action against him; and (4) a casual link exists between his engagement in the protected activity and the adverse employment action.

*Clark v. City of Dublin*, 178 F. App'x 522, 525 (6th Cir. 2006) (citations omitted).

Plaintiff can show she engaged in protected activity when she made a request for an accommodation under the ADA, and certainly defendant knew about that activity because defendant's employees met with plaintiff about the accommodation. However, plaintiff cannot maintain her prima facie case because she cannot show that the defendant

as her employer took an adverse employment action against her. Plaintiff has not demonstrated that she was constructively discharged. Without that showing, there is no adverse employment action to sustain a claim for retaliation under the ADA, and summary judgment is appropriate.

ADEA Claim

Plaintiff alleges that she was discriminated against based upon her age. She alleges in her amended complaint that she was replaced by a "substantially younger employee."

To establish a prima facie case of age discrimination under the ADEA, plaintiff must demonstrate that she was 1) at least 40 years old, 2) qualified for the position, 3) subjected to an adverse employment action, and 4) replaced by a substantially younger person. *See McElroy v Phillips Med. Sys. N. Am., Inc*., 127 F. App'x 161, 166 (6th Cir. 2005) (citing *Grosjean v. First Energy Corp*., 349 F.3d 332, 335 (6th Cir. 2003)). The fourth prong can also be established by the plaintiff showing that she was "treated less favorably than a similarly situated employee from outside the protected class." *Id*. In addition, the plaintiff "retains the ultimate burden of proving that 'age was the "but-for" cause of the employer's adverse action.'" *Harris v. Metro. Gov't of Nashville & Davidson County*, 594 F.3d 476, 485 (6th Cir. 2010) (citing *Gross v. FBL Fin. Servs., Inc*.,129 S. Ct.

2343, 2351 (2009); *Ky. Ret. Sys. v. EEOC*,128 S. Ct. 2361, 2366 (2008). [7]

Defendant contends that there is no proof of age discrimination and in any event plaintiff resigned, so she did not suffer any adverse employment action. Thus, she cannot sustain any claim based on violation of the ADEA.

Plaintiff in response sets out the elements of a prima facie case of age discrimination. However, her argument quickly digresses into a disability discussion without making the required showing for a prima facie case.[8] Plaintiff alleges in her amended complaint that she was replaced by a substantially younger person. She offers no proof to sustain that claim. Defendant stated in a discovery response, "There was no one hired specifically to replace Plaintiff. After Plaintiff's resignation there were three additional separations before a new shipping agent was hired on June 15, 2009." The only proof of age discrimination plaintiff offers is some statistical evidence showing the average ages of persons hired in the shipping department after plaintiff left. Without more, this does show plaintiff was replaced by a "substantially younger" person as she alleges in her complaint.

Nevertheless, plaintiff's age claim also fails for the reason relied on by

_____

[7] In view of the overwhelming emphasis plaintiff has placed on her alleged disability, the court wonders how plaintiff could sustain her ultimate burden of showing that age was the "but for" cause of any adverse employment action by defendant. Nevertheless, she has pled both claims.

[8] Advanced age in and of itself is not an impairment. *Zatarain v. WDSU - Television, Inc.*, 881 F. Supp. 240, 242 n.1 (E.D. La. 1995) (citing 29 C.F.R. § 1630, App. § 1630.2(h) (1994)). The simple fact that plaintiff was 73 years old is not itself a basis to automatically conclude that plaintiff is disabled or unable to work a 10 hour day.

defendant, the lack of an adverse employment action.  As discussed above, plaintiff was not constructively discharged.  Accordingly, summary judgment on plaintiff's ADEA claim is appropriate.

State Law Claims

**Outrageous Conduct**

Plaintiff has asserted a claim for outrageous conduct under Tennessee law. She contends that the actions by JTV employees acted in concert to frustrate, "if not torment" her, because of the repeated requests for doctors' letters, the inquiries about what was wrong with her, the inquiries why a grandmother could not work 10-hour days, and the fact that Tekin threw doctors letters at her amount to outrageous conduct.

Outrageous conduct and intentional infliction of emotional distress are the same cause of action. *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997).  There are three elements to this cause of action under Tennessee law: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Id*. at 622 (citations omitted).  In *Bain*, the Tennessee Supreme Court also noted that it has "adopted and applied the high threshold standard described in the Restatement (Second) of Torts" for determining when particular conduct is tortious. *Id*. at 622-23.  The Court stated:

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. **Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.** Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous." *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274-75 (Tenn. 1966)(emphasis added).

*Id*. at 623.

The court has applied these standards to the conduct alleged in this case. Even drawing all justifiable inferences in plaintiff's favor as called for at summary judgment, the record does not reflect that defendant through its employees engaged in conduct that is "so outrageous that it is not tolerated by a civilized society." *Bain*, at 622. While throwing letters across a table at someone may not be polite or professional behavior, it is hardly conduct that is "atrocious and utterly intolerable in a civilized community." *Id*. at 623. Defendant had every right to request current medical information from plaintiff's doctor's for the pending ADA request, and the fact that plaintiff was a grandmother and

working a 10-hour shift is irrelevant.  Therefore, the court concludes that plaintiff's proof

fails to meet the "high threshold standard" necessary to maintain a claim for outrageous

conduct under Tennessee law.[9]  Accordingly, summary judgment is appropriate.


## State Law Retaliation Claims

Plaintiff has also raised a claims under Tennessee common law, the TDA, and

the THRA for retaliation.

To establish a claim for common law retaliation, plaintiff must prove four

elements:

> (1) that an employment-at-will relationship existed;
> (2) that the employee was discharged;
> (3) that the reason for the discharge was that the employee
> attempted to exercise a statutory or constitutional right, or for
> any other reason which violates a clear public policy evidenced
> by an unambiguous constitutional, statutory, or regulatory
> provision; and
> (4) that a substantial factor in the employer's decision to
> discharge the employee was the employee's exercise of
> protected rights or compliance with clear public policy.

*Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 781 (Tenn. 2010) (citing *Crews v*

*Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002)).  In *Gossett*, the Tennessee

Supreme Court determined that the burden shifting analytical framework of *McDonnell*

---

[9] The court does not need to reach the issue regarding the total lack of proof on the third element for this cause of action, serious mental injury.  The record is void of any proof that plaintiff sustained any mental injury, let alone a "serious" mental injury as a result of the alleged conduct by defendant's employees.

*Douglas* is inapplicable at the summary judgment stage because "it is incompatible with Tennessee summary judgment jurisprudence." *Id*. at 785. However, the Court did not hold that summary judgment itself is inapplicable to the claim. In this case, plaintiff cannot establish at least one of the four required elements to establish her claim, that she was discharged. The court has found that plaintiff was not constructively discharged, but rather that she resigned. Therefore, her common law retaliatory discharge claim fails, and summary judgment is appropriate without any need for a prima facie showing.

The *Gossett* opinion also abrogated *Allen v. McPhee*, 240 S.W.3d 803 (Tenn. 2007), a Tennessee Supreme Court case that addressed retaliation brought under the THRA. The *Gossett* court concluded that without the burden shifting analysis employed in *Allen*, the result would not have been summary judgment favoring the employer. *Id*. at 784. Nevertheless, plaintiff's THRA and TDA claims do not survive summary judgment even without the application of the *McDonnell Douglas* framework.

To establish a claim for retaliation, plaintiff must show the following:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Sutherland v. Lindamood*, No. M2009-02214-COA-R3-CV, 2010 WL 5290062, at *2-3 (Tenn. Ct. App. Dec. 17, 2010) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.

1999)).

Again, without the need for a prima facie showing, plaintiff cannot establish a retaliation claim under the TDA or the THRA because she cannot show an adverse employment action. As discussed above, plaintiff was not constructively discharged; she resigned. Without a showing of constructive discharge, there is no adverse employment action to establish retaliation, and the retaliation claims under state law fail.

IV.

*Conclusion*

For the reasons stated herein, defendant's motion for summary judgment will be granted, and this civil action will be dismissed. An order consistent with this opinion will be entered.

ENTER:

_____s/ Leon Jordan_____
United States District Judge